UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
  UNITED STATES OF AMERICA,               :

                                                           :

                    - against -                  :     **MEMORANDUM**

                                                           :     **DECISION AND ORDER**

  MUZAFFAR NADEEM, also known as        :

  "Nadeem Muzaffar" and "Ali," AFZAAL    :     13 Cr. 424 (BMC)

  CHAUDRY, also known as "Tariq," ZAINUL :

  SYED, also known as "Syed Zainul" and    :

  "Zaine" and IRFAN MUZAFFAR                 :

                                                           :

                            Defendants.       :
---------------------------------------------------------- X

**COGAN**, District Judge.

Defendants were convicted, after an approximately four-week jury trial, of various crimes related to their operation of SM&B Construction Co., Inc. ("SM&B"), a construction company that served as a general contractor for New York City School Construction Authority ("SCA") contracts. Generally, defendants used SM&B to defraud the SCA out of millions of dollars by, *inter alia*, paying workers less than the legally-mandated prevailing wage, bribing a law enforcement agent and union officials, and structuring financial transactions to avoid being caught.

Specifically, the jury found defendant Muzaffar Nadeem ("Nadeem") guilty of all thirteen counts of the superseding indictment: conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349 (Count One); mail fraud, in violation of 18 U.S.C. § 1341 (Count Two); wire fraud, in violation of 18 U.S.C. § 1343 (Count Three); conspiracy to structure financial transactions, in violation of 18 U.S.C. § 371 (Count Four); structuring financial transactions, in violation of 31 U.S.C. §§ 5324(a)(3) and 5324(d)(1) (Count Five); conspiracy to commit federal programs bribery, in violation of 18 U.S.C. § 371 (Count Six); federal programs

bribery, in violation of 18 U.S.C. § 666(a)(2) (Count Seven); conspiracy to make unlawful payments to a union representative, in violation of 18 U.S.C. § 371 (Count Eight); making unlawful payments to a union representative, in violation of 29 U.S.C. 186(a)(1) and 186(d)(2) (Count Nine); money laundering, in violation of 18 U.S.C. 1956(a)(1)(B)(i) (Count Ten); making unlawful monetary transactions over $10,000, in violation of 18 U.S.C. 1957 (Count Eleven); and two counts of subscribing to a false tax return, in violation of 26 U.S.C. § 7206(1) (Counts Twelve and Thirteen). The jury found defendant Zainul Syed ("Syed") guilty of Counts One through Nine, defendant Afzaal Chaudry ("Chaudry") guilty of Counts One through Three, and defendant Irfan Muzaffar ("Irfan") guilty of Counts Four and Five.

Presently before me are defendants' motions under Federal Rules of Criminal Procedure 29 and 33 for judgments of acquittal or a new trial. For the following reasons, each of those motions is denied.

## BACKGROUND

The following is a summary of relevant evidence received at trial and which is related to the claims raised in defendants' post-trial motions.

1. *Prevailing Wage Fraud*

At trial, the Government established that defendants, through SM&B, defendant Nadeem's company, obtained more than $36 million in school construction contracts and payments on those contracts from the SCA between 2007 and 2012. The SCA's Controller testified about SM&B's payment requests to the SCA. He identified a number of such requests, which were admitted in evidence, and testified that each one contained a notarized certification by defendant Nadeem. The certifications provide, in sum and substance, that SM&B was complying with its contractual obligations and with the relevant New York State labor laws.

The SCA Controller further testified that the SCA paid SM&B through the United States Postal Service, and that the SCA would have never made those payments had defendant Nadeem not signed and certified the payment requests.

The jury also heard from the SCA's Director of Labor Law Compliance. She testified that SM&B was required by the main SCA contract, and by New York State labor law, to submit certified payrolls to the SCA. She also testified that SM&B, as the general contractor on SCA jobs, was responsible for submitting certified payrolls for its subcontractor, RZ Construction Corporation ("RZ"). Her testimony continued that the payrolls reflect the amounts a company pays its workers. She identified six sets of certified payrolls which SM&B had submitted for various SCA projects, and which were admitted in evidence. She also testified that New York State Labor Law Section 220 requires that companies that work on public works projects, like SM&B, are required to pay their workers the prevailing wage. Finally, she testified that SM&B submitted some of its certified payrolls electronically through the SCA's online system, a system which utilized servers located in several states.

The Government presented evidence that the certified payrolls and payment requests which SM&B submitted to the SCA were false. The jury heard extensively from Maninder Singh, the Government's cooperating witness and the owner of RZ. He testified that every single one of the hundreds of certified payrolls that SM&B submitted to the SCA on behalf of RZ was false. They misstated the workers' wages and hours, or simply excluded workers who were actually working on the jobsite. He testified about conversations where he and defendants Nadeem and Syed would determine which names would appear on RZ certified payrolls. On some occasions, Singh testified, defendant Syed would forge Singh's signature on the certified payrolls.

The jury also heard from various witnesses that defendants Nadeem, Syed, and Chaudry knew that SM&B was required to pay its workers the prevailing wage, and that these defendants took steps to avoid being detected by the SCA for their failure to do so. For example, Investigator Lavale Jackson testified that in a post-arrest interview, defendant Nadeem indicated that all SM&B workers on SCA jobs had to be paid the prevailing wage. Retired Internal Revenue Service ("IRS") Special Agent James Hughes testified that defendant Syed admitted, in a post-arrest interview, that RZ workers on SM&B jobs were paid off the books at rates below the prevailing wage. Defendant Syed also admitted that two certified payrolls that SM&B submitted for SCA jobs were false and did not accurately reflect which workers were on the jobsite. He even admitted to directing an SM&B office worker to create the false certified payrolls. Maninder Singh testified that defendant Chaudry had knowledge of this scheme and that while on SM&B jobsites, Singh heard defendant Chaudry direct workers to tell any SCA inspector that came to the jobsite that they were receiving the prevailing wage. Moreover, at least two SM&B workers testified that defendant Chaudry personally gave them their wages in cash, and that those wages were below the prevailing wage. Finally, defendant Chaudry's ledger, which was recovered from his apartment, was received in evidence. The ledger tracked SM&B's workers' hours and pay, and showed that they were being paid rates below the prevailing wage.

Finally, the jury heard from four individuals (including the two mentioned above) who worked for SM&B/RZ on SCA jobsites. Each testified that some of his salary was paid in cash, in amounts below the prevailing wage. Two of them testified that they were paid exclusively in cash. Neither of those two individuals was ever listed in an SM&B certified payroll. They were, however, listed in SM&B's "off the books" pay sheets, which were admitted in evidence.

4

2. *Federal Programs Bribery*

Next, the jury was presented with evidence that defendants attempted to bribe an undercover SCA investigator in order to conceal the prevailing wage fraud. Maninder Singh testified that he paid an individual he believed to be an SCA inspector (and who he later learned was an undercover SCA investigator) a total of $30,000 in bribes on three separate occasions (two payments of $5,000 and one payment of $20,000) between February and July 2011. Singh testified that he paid these bribes at the direction of defendant Nadeem during a conversation in which defendant Syed was also present. Furthermore, Singh identified a number of checks written from SM&B's account to RZ, which were admitted in evidence, that he received from defendants Nadeem and Syed to pay the bribes. He testified that they paid the two $5,000 bribes to prevent the inspector from telling the SCA how many people were actually working at SM&B jobsites. They paid the $20,000 bribe so that the inspector would get the SCA to approve one of SM&B's subcontractors to work on an SCA jobsite.

3. *Unlawful Payments to a Union Official*

Along the same lines, Singh testified about bribes he paid to Russell Argila, a shop steward for Local 1, the union for Bricklayers and Allied Craftworkers. Singh testified that Argila approached him at the worksite for a school renovation that SM&B was undertaking for the SCA. Argila told Singh that he would not report the number of non-union workers that SM&B had working on the jobsite in exchange for money. After discussing the request with defendants Nadeem and Syed, and after receiving defendant Nadeem's permission, Singh paid Argila approximately $5,000.

Moreover, after Singh began cooperating with the Government, he testified that he again met Argila at another SM&B jobsite. Argila again solicited money in exchange for not reporting

5

the number of non-union workers SM&B had at the jobsite. Singh testified that in response, he spoke to defendant Nadeem, who sanctioned the payment to Argila.

The jury also heard audio recordings of conversations that Singh had with defendant Syed with respect to these bribes. During one particular conversation, the jury heard Singh and defendant Syed discussing the payment of $1,600 to "Russell" and during which defendant Syed seeks and receives confirmation from defendant Nadeem to make this payment.

Finally, the jury viewed photographs of envelopes marked with the letter "R" and filled with cash, which were received in evidence, and which Singh explained were prepared to be paid to Argila. The jury also saw video evidence which depicted meetings between Singh and Argila, and which in one instance showed Singh handing an envelope of cash to Argila. Singh testified that he gave Argila the money at that time so Argila would not report the number of non-union workers at the jobsite to the union.

4. *Structuring*

With respect to the structuring counts, the Government presented evidence that defendants Nadeem, Syed, and Irfan structured their checks in amounts under $10,000 to conceal the prevailing wage fraud. Specifically, Singh testified that in order to pay workers in cash, he (and SM&B) would use a New Jersey check-cashing business named Pacific New Jersey Corporation ("Pacific"). He detailed a conversation he had with an employee of Pacific where the employee told him that Pacific would have to report checks for more than $10,000 to the IRS. Singh testified that he relayed this information to defendants Nadeem and Syed, who agreed to begin cashing checks for less than $10,000. These checks were written to three shell companies, A-1 Builders Group Inc. ("A-1"), Harry & Brothers Construction Inc. ("Harry & Brothers"), and RZ Construction & Development ("RZ Construction"). The jury heard

6

testimony from Singh as well as the engagement partner at SM&B's accounting firm that these companies were created solely for the purpose of cashing checks at Pacific.

Furthermore, IRS Special Agent Thomas Cribbins testified that between January 2007 and May 2012, more than $4.2 million in structured SM&B checks were cashed at Pacific. Special Agent Cribbins testified about a summary chart, which was admitted in evidence, which listed the 537 SM&B checks written to A-1, Harry & Brothers, and RZ Construction, and cashed at Pacific, between January 2007 and May 2012. Each check was written in an amount under $10,000. However, the chart shows that on a number of days, multiple SM&B checks totaling more than $10,000 were cashed at Pacific.

Retired IRS Agent John Lopez testified about surveillance he conducted at Pacific on July 26, 2011. On that date, he testified that he observed defendant Irfan arrive at Pacific, enter the premises, and leave it with a brown paper bag. Photographs received in evidence corroborated this testimony. Special Agent Cribbins, who was also conducting surveillance at Pacific that day, testified that three SM&B checks payable to RZ Construction, and all written in amounts under $10,000 were cashed at Pacific. The checks totaled more than $24,000.

Lastly, Singh testified that defendant Irfan made a number of other trips to Pacific to cash checks. In fact, Singh testified that he and defendants Syed and Irfan had discussed how they would act if they were ever stopped by police while holding a large amount of cash after cashing checks at Pacific. During that conversation, defendant Syed confirmed that he knew that any transaction "[i]f it's more than ten[] [had to be reported] [t]o the IRS."

5. *Money Laundering and Unlawful Transactions Over $10,000*

The Government also offered evidence that between April 2007 and July 2011, defendant Nadeem laundered money and engaged in unlawful transactions over $10,000 in order to hide

7

the proceeds of the prevailing wage fraud. Special Agent Cribbins testified that of the $36 million that SM&B obtained from the SCA, more than $7 million was transferred from SM&B to shell companies AM Construction of New York, Ltd. ("AM Construction"), National Construction & Equipment ("National"),[1] Razi Contracting Inc. ("Razi"), and RZ.[2] From there, the money was transferred to defendant Nadeem's family and friends, a Pakistani amusement park called Wayzgoose Park (in which defendant Nadeem had a business interest), or to purchase amusement park rides. In connection with this testimony, the Court admitted Government's Exhibit 1400-I, over defendants' objection, which is a chart summarizing the flow of money from the SCA to SM&B and then to various other entities and individuals.

The jury heard from SM&B's corporate accountants, Joseph Woolfson and Andrew Posses, who expressed concern about these expenditures to defendant Nadeem and SM&B. Mr. Woolfson testified that he raised questions about the large volume of payments that SM&B claimed were being made to the shell company subcontractors named above. However, defendant Nadeem and SM&B never provided any explanation for those expenditures. Mr. Posses, Mr. Woolfson's boss, also asked defendant Nadeem for this documentation, but never received it. He testified that he questioned SM&B's payments to the shell companies because they were not approved subcontractors. Ultimately, Mr. Posses and his firm did not issue a financial statement for SM&B because "they were not in compliance with the correct way of doing business."

---

[1] The jury heard evidence that defendant Syed owned National.

[2] Defendant Nadeem's accountant, Pio Andreotti, testified that AM Construction and National were shell entities that he opened at the direction of defendant Nadeem. Those companies had no employees or payrolls. Mr. Andreotti also testified that he had written letters on behalf of RZ at defendant Nadeem's request, but that he never did the taxes or payrolls for that company. Finally, he testified that he opened Razi for defendant Nadeem.

6. *False Tax Returns*

Finally, the Government presented evidence that defendant Nadeem willfully subscribed to false tax returns in 2008 for himself and for SM&B. Kristy Morgan, an IRS employee, testified that defendant Nadeem signed both his individual federal income tax return and SM&B's federal income tax return in 2008 under penalty of perjury. Special Agent Cribbins testified that the tax returns reflected more than $4 million in deductions which were not made for business purposes, but were payments made by SM&B to the shell companies. Thus, Special Agent Cribbins testified that the false deductions reduced SM&B's income and the tax liability of defendant Nadeem, the sole owner of SM&B, an S-Corporation.

**LEGAL STANDARD**

"To set aside a jury verdict [pursuant to Rule 29] on the ground that there was insufficient evidence to establish the elements of a criminal offense, a defendant must demonstrate that there was no evidence from which a reasonable mind 'might fairly conclude guilt beyond a reasonable doubt.'" United States v. Strauss, 999 F.2d 692, 696 (2d Cir.1993) (citing United States v. Mariani, 725 F.2d 862, 865 (2d Cir.1984) (quoting United States v. Taylor, 464 F.2d 240, 243 (2d Cir. 1972))). A court may enter a judgment of acquittal "only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" United States v. Guadagna, 183 F.3d 122, 130 (2d Cir.1999) (quoting United States v. White, 673 F.2d 299, 301 (10th Cir.1982)). In considering a Rule 29 motion, the Court must "review all of the evidence presented at trial 'in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government.'" United States v. Walker, 191 F.3d 326, 333 (2d Cir. 1999) (quoting United States v. Hernandez, 85 F.3d 1023, 1030 (2d Cir. 1996)). Thus, the burden placed on a

defendant in these circumstances is "heavy."  United States v. Desimone, 119 F.3d 217, 223 (2d Cir. 1997).

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."  United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001).  "There must be a real concern that an innocent person may have been convicted."  Id.

## DISCUSSION

### I. Sufficiency of the Evidence

Defendants' motions consist largely of conclusory claims that the evidence offered at trial was insufficient to support their convictions.  This is not at all surprising since the evidence presented at trial as to each count in the superseding indictment was substantial.  Defendants are essentially asking me to second-guess the jury, which is something that I cannot do.  See United States v. Payne, 591 F.3d 46, 60 ("Assessments of witness credibility and choices between competing inferences lie solely within the province of the jury.").  As a result, defendants have not met their burden on their sufficiency challenges.  Each charge is addressed below.

#### A. *Mail and Wire Fraud*

"The essential elements of a mail or wire fraud violation are: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme."  United States v. Weaver, No. 13 Cr. 120, 2014 WL 259504, at *2 (E.D.N.Y. Jan. 10, 2014) (quoting United States v. Litwok, 678 F.3d 208, 213 (2d Cir. 2012)).  Defendants' participation in such a scheme must have been knowing and intentional.  See United States v.

10

Regan, 937 F.2d 823, 827 (2d Cir.) amended, 946 F.2d 188 (2d Cir. 1991) (explaining that mail and wire fraud are specific intent crimes).

Additionally, "[t]o sustain a conspiracy conviction, the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." United States v. Anderson, 747 F.3d 51, 60 (2d Cir. 2014) (citation and quotation marks omitted). The Government need not prove that a defendant was familiar with all details of the conspiracy. It is enough that it demonstrate that the defendant knew the "general nature and extent" of the conspiracy. Id. at 61 (citation omitted). This is the standard for all of the charged conspiracies in this case.[3]

Defendants Nadeem, Syed, and Chaudry challenge the sufficiency of the evidence with respect to their convictions for mail fraud, wire fraud, and conspiracy to commit mail and wire fraud. However, they do not highlight which elements of the crimes were they believe were insufficiently proven. Regardless, their convictions as to these counts were supported by sufficient evidence.

Defendant Nadeem argues that there was insufficient evidence that he knowingly participated in a conspiracy to commit mail and wire fraud and that there was "no credible evidence that [he] intended to cause any fraudulent information to be disseminated via mail or wire." These arguments are belied by the record. The Government presented evidence at trial that defendant Nadeem signed and certified all payment requests made on behalf of SM&B to the SCA. The jury saw those records and heard testimony that these payment requests contained false certifications that SM&B was complying with New York State labor laws. Of particular

---

[3] Although a conviction under 18 U.S.C. § 1349, conspiracy to commit mail and wire fraud, does not require proof of an overt act, see United States v. Roy, 783 F.3d 418, 420 (2d Cir. 2015), the other conspiracies charged in this case do require proof of an overt act. See United States v. Pinckney, 85 F.3d 4, 8 (2d Cir. 1996).

11

relevance was the testimony of Maninder Singh who testified that he spoke with defendants Nadeem and Syed regarding who they would list as workers on RZ's payroll sheets. Thus, the jury had ample evidence to conclude that defendant Nadeem knew these certifications were false, and that he was aware of and participated in the mail and wire fraud as well as the conspiracy.

Defendant Syed makes essentially the same claims as defendant Nadeem. They are similarly meritless. Defendant Syed explicitly acknowledge his role in the prevailing wage scheme in his post-arrest statements. He admitted that RZ workers on SM&B jobs were paid off the books at rates below the prevailing wage, that two certified payrolls that SM&B submitted for SCA jobs were false, and even that he directed an SM&B office worker to generate false certified payrolls. The jury also heard a number of audio recordings in which defendant Syed was preparing cash envelopes used to pay SM&B workers. The jury could have properly convicted defendant Syed on the basis of this evidence.

Finally, defendant Chaudry claims that there was no evidence that he "acted together with other co-defendants" as part of the prevailing wage conspiracy. He continues that there was no evidence that he sent any of the fraudulent documents submitted to the SCA on behalf of SM&B or that he was "directly involved in the management or operation of SM&B." However, the jury heard from Singh that defendant Chaudry told workers to lie and tell SCA inspectors that they were being paid the prevailing wage. In addition, defendant Chaudry's ledger was received in evidence. The ledger showed that he tracked the hours and pay rates for SM&B's workers. The ledger showed that workers were being paid below the prevailing wage. Defendant Chaudry's role in this fraud was clear, and the jury did not err in so finding.

Likewise, to the extent defendants are challenging the credibility of the evidence and arguing that there should be a retrial, there is no basis for one. Letting defendants' convictions

stand would not result in a manifest injustice. Defendants had a full opportunity, and did in fact, vigorously cross-examine the Government's witnesses as to any credibility issues. The jury was able to consider these arguments, and it rejected them. There is no real concern that defendants were wrongfully convicted.

B. *Structuring*

In order to be convicted of structuring in violation of 31 U.S.C. § 5324 the Government must prove that: (1) the defendant engaged in acts of structuring; (2) the defendant acted with knowledge that the financial institution involved was legally obligated to report currency transactions in excess of $10,000; and (3) the defendant acted with the intent to evade the reporting requirement. See United States v. MacPherson, 424 F.3d 183, 189 (2d Cir. 2005).

Defendants Nadeem and Syed argue that there is no evidence of their intent to structure because "the evidence clearly stated the owner of the Pacific check cashing company decided the amount of the checks to be cashed." However, there is no such evidence in the record. Instead, the evidence showed that Singh was told from a Pacific employee that checks over $10,000 would need to be reported to the IRS. Defendants Nadeem and Syed, in a conversation with Singh, then decided to attempt to avoid the reporting requirement by cashing checks under $10,000. In fact, all 537 of the structured checks were written from SM&B's account. Thus, the jury could have properly concluded that defendants Nadeem and Syed possessed the requisite intent to structure the checks.

Defendant Irfan argues that the evidence at trial was insufficient to prove that "he knowingly participated in a conspiracy with the intent to evade the reporting requirements." He maintains that there was no evidence that he knew that Pacific had an obligation to file currency

transaction reports nor was there any evidence that defendant Irfan, by cashing these checks, had the requisite intent to circumvent the reporting requirements. This, too, is incorrect.

The jury heard testimony that defendant Irfan made a number of trips to Pacific to cash checks totaling more than $10,000. Moreover, he was observed entering and leaving Pacific on a date where bank records reflect that structured checks were cashed at Pacific. Finally, defendant Irfan was present during a conversation in which defendant Syed and Maninder Singh discussed Pacific's reporting requirement. He also discussed with the other two what they would do if stopped by police after cashing checks at Pacific. The jury could fairly infer that defendant Irfan was aware of the reporting requirement and that he was participating in an attempt to evade it.

C. *Federal Programs Bribery and Unlawful Payment to a Union Representative*

Defendants Nadeem and Syed argue that the Government did not meet its burden to prove, beyond a reasonable doubt, that either of them participated in the bribery of the SCA agent, the unlawful payments to the union official, and the related conspiracy crimes. They assert that the testimony of Singh was completely incredible as to the defendants' roles in these crimes.

However, the jury was entitled to credit Singh's testimony about the money paid to these individuals and the respective roles of defendants Nadeem and Syed. Singh testified that he paid these bribes at the direction of defendant Nadeem during a conversation in which defendant Syed was also present. Furthermore, Singh identified a number of checks written from SM&B's account to RZ, which were admitted in evidence, that he received from defendants Nadeem and Syed to fund the bribes. In addition, evidence corroborating Singh's testimony included photographs of the envelopes filled with cash, audio recordings, videos, testimony of law enforcement agents, and SM&B checks written to fund the bribes.

14

Defendants again are asking me to disregard the jury's opinion as to Maninder Singh's credibility. Again, I will not do so. There is neither a basis for a judgment of acquittal or a new trial on this ground.

### D. *Subscribing to a False Tax Return*

Defendant Nadeem challenges his conviction for knowingly subscribing to false tax returns because there were other individuals who processed his tax returns. There is no basis for this argument. Defendant Nadeem signed both his individual federal income tax return and SM&B's federal income tax return in 2008 under penalty of perjury. These returns were materially false because they reflected deductions as legitimate SM&B business expenses, but which were actually payments to shell companies. This allowed defendant Nadeem to reduce SM&B's income as well as his own tax liability. The jury had a sufficient basis to convict defendant Nadeem for these crimes.

### E. *Money Laundering and Making Unlawful Monetary Transactions Over $10,000*

Although defendant Nadeem objects generally that he has not "committed the crimes charged in the indictment," he does not specifically challenge his convictions for money laundering and making unlawful monetary transactions over $10,000. This is not surprising because the evidence proving these crimes was substantial. The Government offered evidence that of the $36 million that SM&B obtained from the SCA, more than $7 million was transferred from SM&B to shell companies, and from those shell companies to defendant Nadeem's family and friends. It was also used to invest in certain of defendant Nadeem's overseas business interests. These transactions were so suspicious that defendants' corporate accountant refused to issue a financial statement for SM&B.

Consequently, the evidence was sufficient for the jury to convict defendants of all crimes alleged in the superseding indictment.

## II. Government's Statements During Summation

Defendants Nadeem and Syed argue that a new trial is warranted based on certain statements made during the Government's rebuttal summation.[4] Although the Second Circuit has held that reversing a criminal conviction on the basis of prosecutorial misconduct is a "drastic remedy . . . when a prosecutor's tactics cause substantial prejudice to the defendant and thereby serve to deprive him of his right to a fair trial, reversal is mandated." United States v. Valentine, 820 F.2d 565, 570 (2d Cir. 1987). A defendant's due process rights are violated when a prosecutor makes a knowing misrepresentation of the evidence. Id.

Defendant Nadeem argues that the Government improperly stated that he engaged in subscribing to a false tax return, cost structuring, and bribing a union official. He continues that the Government never introduced any evidence that defendant Nadeem personally cashed any checks, or had any direct connection to bribing the union official. He also argues that the Government did not disclose that SM&B operated at "minimal profit" during the timeframe of the Government's case. Essentially defendant Nadeem is asking me to conclude that the Government made misstatements by never introducing certain evidence and by failing to disclose certain evidence. This argument is without merit. He cites to no cases, and nothing in the record to support his claim. The Government's argument during summation was proper.

Defendant Syed claims that the Government improperly argued that he received money from his role in the prevailing wage fraud. He argues that this statement was misleading because

---

[4] Defendant Chaudry also moves pursuant to Rule 33 on the basis that "the government committed several acts of misconduct." However, he does not specify the Government's alleged misconduct. To the extent he is making such an argument, his motion is denied on this point as the Government made proper argument in summation with respect to defendant Chaudry.

16

without receiving a benefit from the conspiracy, he was not a knowing participant. The Government did not make any misstatement to the jury. It argued that defendant Syed may have received some of the money that flowed from SM&B through National, a shell company he owned. Moreover, the Government argued that he received a salary and a car from SM&B, a company that derived its revenues from the prevailing wage fraud. Finally, defendant Syed did not need to receive money in order to be found guilty of the crimes with which he was charged.

The Government did not make any misstatements during summation and, as explained above, there was substantial evidence of defendants' guilt.

### III. Testimony of the Government's Expert Richard Guerci

Federal Rule of Evidence 704 permits the offering of opinion evidence on the ultimate question, but bars expert witnesses in criminal cases from "stat[ing] an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged . . . [t]hose matters are for the trier of fact alone."

Defendants Nadeem and Syed next argue that a new trial is warranted because the testimony from the Government's money laundering expert Richard Guerci was improper.[5] They state that his testimony "mirrored the evidence in the case" and was "significantly beyond authorized opinion testimony." His testimony, they argue, consisted of many statements that implied the defendants' actual mental states at the time of the crimes.

First, the portions of testimony cited by defendants as improper largely focus on a period where the witness introduced a blank currency transaction report to the jury and offered a general explanation about their purpose. Second, defendants' also acknowledge that the witness never actually testified that any of the defendants specifically did or thought something. This

---

[5] Again, it is unclear whether defendant Chaudry is making this argument. To the extent he is joining in the argument made by defendants Nadeem and Syed, the analysis below applies to him as well.

17

admission is telling as defendants do not make any showing about what specific testimony caused them prejudice. In fact, during the trial, I sustained a number of defendants' objections where I believed the witness was being asked to offer an opinion about defendants' intent. I also instructed the jury that this witness's testimony was only being offered as background and not as evidence of defendants' intent.

Thus, the witness's testimony was proper,[6] and defendants' motion for a new trial on this point is denied.

**IV. Admission of Government's Exhibit 1400-I**

Finally, defendants Nadeem, Syed, and Chaudry argue that I improperly admitted Government Exhibit 1400-I in evidence. That exhibit is a five-page chart that graphically depicts the flow of money based on bank records that were received in evidence. Defendants argue that the chart improperly bolstered the testimony of the Government's witnesses. They are incorrect.

Federal Rule of Evidence 1006 permits the proponent of evidence to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." I admitted this exhibit, over defendants' objections at trial, because it is a summary of documents that were already in evidence. Admitting this chart saved what would likely have been hours of testimony from Special Agent Cribbins about hundreds of individual checks.

Defendants' citation to United States v. Groysman, 766 F.3d 147 (2d Cir. 2014), is unpersuasive. That case involved the admission of charts that reflected "pictorial representations of hearsay testimony." Id. at 156. Exhibit 1400-I was not representation of hearsay testimony,

---

[6] Because the witness's testimony was proper, the cases cited by defendants', United States v. DiDomenico, 985 F.2d 1159 (2d Cir. 1993) and United States v. Garcia, 413 F.3d 201 (2d Cir. 2005), are inapposite.

18

but rather was a summary of many business records already admitted in evidence. Likewise, defendants' reliance on United States v. Whitfield, 590 F.3d 325 (5th Cir. 2009), is strange. There, the Fifth Circuit found that the district court did not abuse its discretion by admitting charts summarizing financial transactions and allowing the Government's witness to explain those charts. That is exactly what happened in this case.

Importantly, defendants do not allege that the exhibit is inaccurate or misleading. They had a full and fair opportunity to cross-examine Special Agent Cribbins about this exhibit and suffered no prejudice as a result of its admission. No new trial is warranted.[7]

## CONCLUSION

Defendants' motions [203, 204, 205, 206] are denied.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
October 5, 2015

---

[7] Defendants also argue that the admission of this exhibit, in conjunction with the testimony of Richard Guerci, constituted a pattern of witness bolstering that requires a new trial. For the reasons discussed above, this argument is without merit.